## WESTINGHOUSE ELECTRIC CORPORATION *v.* STATE TAX COMMISSION

[No. 90, October Term, 1954.]

*Decided February 23, 1955.*

394

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Theodore C. Waters* and *William B. Rafferty*, with whom were *Harrison L. Winter, Theodore C. Waters, Jr.,* and *Miles & Stockbridge* on the brief, for the appellant.

*Ambrose T. Hartman, Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from an order affirming an assessment against Westinghouse Electric Corporation, (Westinghouse), appellant, for personal property taxes for the calendar year 1953, made by the State Tax Commission of Maryland, (Commission).

Westinghouse in its tax return of personal property as of January 1, 1953, reported as the average monthly value of merchandise and products manufactured by it in Maryland for the calendar year 1952, the amount of $9,132,961.00, of which amount $6,191,162.00 had a taxable situs in Baltimore County. In its return it was asserted that of this amount, $4,027,910.00 was exempt from assessment and taxation in Baltimore County for the reason that the sovereign immunity of the United

States of America, (the Government), to State and local taxation had attached to merchandise and products of that value. On November 13, 1953, the Commission made a tentative assessment against appellant of personal property subject to taxation in Baltimore County of $6,053,570.00. This assessment thereby granted to Westinghouse an average monthly exemption of $137,592.00 of the total average monthly exemption of $4,027,910.00 claimed. After a protest was filed, a hearing was held before the Commission on December 10, 1953. As a result of that hearing, on December 16, 1953, the Commission made a final assessment, in which it fixed the average monthly assessment for manufactured products of raw materials subject to State and local taxation in Baltimore County at $5,820,480.00. The Commission thereby granted to the appellant a portion of the claimed exemption, but denied the balance of the exemption in the amount of $3,627,350.00. From that assessment the appellant, under the provisions of Code, 1951, Article 81, Section 255(b), filed an appeal in Circuit Court No. 2 of Baltimore City. After hearing, that court entered an order affirming the assessment by the Commission. From that order appellant appeals here.

Westinghouse, incorporated in Pennsylvania, has its principal office in Pittsburgh. Its business consists of the manufacture, sale and installation of electrical and steam apparatus. It carries on such business in Baltimore City; Friendship Airport, Anne Arundel County, Maryland; and Lansdowne, Baltimore County, Maryland. The operation in Baltimore City is principally the manufacture of X-ray equipment for hospitals and radiologists. The manufacturing for Government sales there is comparatively small. The same kind of articles are manufactured in Baltimore City for Government sale as are manufactured for industrial, private and hospital use. At Friendship Airport, Anne Arundel County, appellant manufactures, solely military products. At Lansdowne, Baltimore County, both commercial equipment and equipment for the military services of the United

States are manufactured. No substantial amount of merchandise of commercial design manufactured there is sold to the Government. The large proportion of the manufacturing at Lansdowne is for the military services. In most cases the equipment there is pecularily designed for military needs and has no use in industry or in civilian life. The appellant admits that it buys and pays for the parts and materials in the process of manufacture, pursuant to contracts with the Government.

On account of national security many provisions of appellant's contracts with the Government remain secret. However, the appellant introduced in evidence examples of parts of contracts relating to payment and acceptance by the Government. Such contracts provide: "Seventy-five percent (75%) of the total contract price for such items shall be paid as partial payments in accordance with the provisions of this paragraph * * *." There is a further provision that the contractor may request partial payments on account. The amount of the partial payments are figured upon a percentage of value, by comparison with the total contract price, of the work finished during the interval for which the particular partial payment is made. In the examples offered the percentages are seventy-five and eighty-five. The balance or final payment is to be paid upon delivery and final acceptance. The sample contracts also contain the following clause: "In the event that the Contractor shall procure or maintain insurance upon any materials or other property upon which a lien exists in favor of the Government pursuant to the terms of this clause, the policy or policies shall contain a loss payable clause making losses payable to the Secretary of the Navy or order. Any payments thereunder shall inure to the benefit of the Government to the extent of any loss suffered by the Government and to the Contractor as to any remaining balance. The foregoing provisions shall not be deemed to require that the Contractor procure or maintain any such insurance."

Under the provision of Code, 1951, Article 81, Section 7(2), a tax is imposed on tangible personal property according to the rates fixed from time to time by the State and its political sub-divisions. A corporation's tangible personal property is valued and assessed by the Commission pursuant to the authority vested in it by Code, 1951, Article 81, Section 12(b)(5). Before the Commission, and at the hearing in the Circuit Court, Westinghouse took the position that the personal property for which it claimed exemptions was held by it under one of the following four types of contracts:

"1. Contracts which had been terminated and which by their terms vested legal title to the property manufactured thereunder in the United States;

2. Contracts which provided for the making of progress payments as the work progressed and which also provided that upon the making of a progress payment, title to the property in its then state and thereafter should vest in the United States;

3. Contracts which provided for the making of progress payments as the work progressed and which specifically created a lien on the property in the course of manufacture in favor of the United States upon the making of a progress payment; and

4. Contracts which provided for the making of progress payments as the work progressed but which contained no specific provision either vesting title or creating a lien upon the property in the course of manufacture in favor of the United States upon the making of a progress payment."

The Commission and the Court held that property manufactured under paragraphs 1 and 2, *supra,* was exempt from assessment and taxation because the sovereign immunity of the Government to State and local taxation

had attached thereto, but that property manufactured under paragraphs 3 and 4, *supra,* was not so exempt.

The Commission, appellee, points out that there is a fifth class of personal property manufactured by appellant for which no exemption is claimed and that is the type of contract which does not provide for progress payments from the Government. Appellant says that this class developed the day the case was presented to the Commission. Mr. Frank W. Godsey, Jr., general manager of the Baltimore division of appellant corporation, testified that until about a year ago there was an advantage to appellant in not receiving progress payments for the reason that the type of contract, which required the progress payments, afforded a lower profit to the corporation than those which did not require progress payments. This profit advantage no longer exists and, therefore, appellant now presses for the type of contract which requires progress payments.

The question, therefore, before us is whether personal property manufactured under the contracts in paragraphs 3 and 4, *supra,* should be exempt from assessment and taxation because of the sovereign immunity of the Government.

The appellant claims immunity for several reasons. It claims that the material ordered by the Government can be sold to and used by the Government alone. It admits that its own funds were used to finance the manufacture of this equipment at least until such times as it becomes entitled to progress payments. If the Government rejects the materials, they must be reworked or scrapped and the salvage value of their component parts credited to the Government. It contends that it is subject to the most rigid system of supervision and control and the Government has removed from appellant its customary dominion and control over these products.

Of course, the Government is immune to State and local taxation. *M'Culloch v. Maryland,* (1819), 4 Wheat. (U. S.) 316, 4 L. Ed. 579; *United States v. County of Allegheny,* (1944), 322 U. S. 174, 88 L. Ed. 1209, (the

*Mesta* case). In early cases the Supreme Court of the United States gave a rather broad scope of immunity. This immunity has recently been narrowed. *Helvering v. Mountain Producers Corp.*, 303 U. S. 376, 82 L. Ed. 907; *Graves v. New York*, 306 U. S. 466, 477, 83 L. Ed. 927, 931; *Oklahoma Tax Commission v. Texas Co.*, 336 U. S. 342, 93 L. Ed. 721. In the early cases it had been held that because of its economic incidence on the Government the tax was an unconstitutional interference by a state with the functions of the Federal Government. The Supreme Court of the United States has receded from that position. *James v. Dravo Contracting Co.*, 302 U. S. 134, 82 L. Ed. 155. It was held by this Court in *Meade Heights v. Tax Commission of Maryland*, 202 Md. 20, 95 A. 2d 280, that a property interest, less than a fee, is not exempted under the constitutional immunity and is subject to taxation in this State.

The apellant claims that, although the Government does not have legal title to the property, it does have equitable title or such dominion, control and ownership over that property that it amounts to equitable title. It relies strongly on *United States v. County of Allegheny*, (the *Mesta* case), *supra*. In that case the State of Pennsylvania levied a tax upon the real estate of the Mesta Corporation. Assessed as part of the value thereof was certain machinery owned by the United States and leased to Mesta for use in Government contracts. It was there admitted that title to the machinery was in the Government. In that case the Supreme Court of the United States said, Justices Roberts and Frankfurter dissenting: "We hold that Government-owned property, to the full extent of the Government's interest therein, is immune from taxation, either as against the Government itself or as against one who holds it as a bailee." The appellant also relies on *Kern-Limerick, Inc. v. Scurlock*, (1954), 347 U. S. 110, 98 L. Ed. 546. In that case private contractors constructed for the United States a naval ammunition depot. The State of Arkansas attempted to collect a sales tax on certain trac-

tors procured from Kern-Limerick, Inc., a local dealer. It was conceded that Kern-Limerick would be liable for a sales tax if the real purchaser were not the United States. There, the Government was named as the purchaser of the material. The contract under which the work was done provided that the contractor was to act as purchasing agent and that title to the material and equipment was to pass directly from the vendor to the Government, which was obligated to reimburse the contractor for the purchases. It was there held in an opinion written by Mr. Justice Reed, speaking for six members of the Supreme Court, that "* * * it is clear that the Government is the disclosed purchaser and that no liability of the purchasing agent to the seller arises from the transaction." Chief Justice Warren and Justices Black and Douglas dissented on the ground that the Government could not delegate to private persons authority to buy goods for the Government. In that opinion the majority of the Supreme Court distinguished that case from *Alabama v. King & Boozer*, 314 U. S. 1, 86 L. Ed. 3, on the ground that the Alabama courts made the "purchaser" liable for the tax to the seller and under the contract in that case King and Boozer were the purchasers, while under the contract in *Kern-Limerick, Inc., supra*, the Government was the purchaser. We cannot agree with appellant's claim that *Kern-Limerick, Inc., supra*, reverses *King & Boozer, supra*.

The appellant also relies strongly on the case of *Johns Hopkins University v. County Commissioners of Montgomery Co.*, (1946), 185 Md. 614, 45 A. 2d 747. In that case the Government asked Johns Hopkins University to undertake and carry out certain operations relating to the then war efforts of the Government. It entered into a contract with Hopkins under which it purchased for the Government forty acres of land in Montgomery County, Maryland, and erected thereon a plant to carry out scientific research for the Government. When the plant was erected the Government moved its men and equipment to the new plant. Hopkins paid for the land,

the erection of the plant, the cost of operations and production, and the taxes on the plant, all of which were repaid by the Government to Hopkins. The contract also provided that Hopkins should convey to the Government or its designee, when directed, any land purchased under said agreement, together with all buildings and appurtenances thereto. The title to the plant on the land records for Montgomery County was in the name of Johns Hopkins University, which was assessed for tax purposes. Hopkins contested the tax asserting that its interest in the property was solely as agent or trustee for the Government and, therefore, the plant was exempt from taxation under the sovereign immunity of the United States. This Court in that case held that Hopkins held the mere naked title and as Hopkins under the contract was bound to deed the property to the Government or its designee, it could not be said that the Government had no interest in the property in question. Relying on the *Mesta* case, *supra*, it was there held that the property was exempt from taxation because the tax was one upon the property of the United States.

The instant case is readily distinguishable from the *Mesta* case, *supra, Kern-Limerick* case, *supra,* and *Johns Hopkins University v. Montgomery County, supra.* Here, the legal title was in the appellant. Its money was used for the purchase of all materials and to pay all labor in the manufacturing process. It was neither the general agent nor the purchasing agent of the Government. If it had been so intended, such a provision could have been put in the contracts. This was not done. The appellant here was an independent contractor. The Government had the right to refuse to take the materials up until the last minute. If the Government felt that it had title to the property before final payment and acceptance, this could have been provided in the contracts to give the constitutional immunity. If the Government obtained title before final payment and acceptance or, if its lien became a property interest, it would have required insurance on the materials. The provision in the contracts,

heretofore set out, as to the interest of the Government in any insurance carried by the appellant, is similar to provisions in insurance policies protecting lienors. A mortgagee, as such, is not personally liable for the taxes on the property which secures the mortgage. Of course, failure to see that the owner of the property paid the taxes might result in a loss of the lien of the mortgage. A person could hardly be said to have a lien on property to which he had the title. The lien here provided by the contracts would not create an ownership interest in the Government. A lien is merely a charge upon the thing as security for a debt. *Watson v. Hobson,* 401 Ill. 191, 81 N. E. 2d 885, 7 A. L. R. 2d 1156; *Re Interborough Consolidated Corp.,* (2nd Cir,), 288 Fed. 334, 32 A. L. R. 932; *Jamison Coal & Coke Co. v. Goltra,* (8th Cir.), 143 Fed. 2d 889, 893, 154 A. L. R. 1191; *Hansel v. Hartford-Conn. Trust Co.,* 133 Conn. 181, 49 A. 2d 666, 673. As to appellant's contention that the progress payments and the liens which are created thereby for the money advanced, creates the constitutional immunity, this argument really is that, when the payments are made, the Government purchases the material. The law seems to be, however, that where a total price for work is fixed by a contract, the work is not rendered divisible by the progress payments, particularly where the contract provided that the total price is not to be paid until the work is completed. *Heinse v. Howard,* 153 Md. 380, 138 A. 255; *Integrity Flooring, Inc. v. Zandon Corp., Inc.,* 130 N. J. L. 244, 32 A. 2d 507; *United States v. U. S. Fidelity & Guaranty Co.,* 236 U. S. 512, 59 L. Ed. 696; *Fidelity Trust Co. v. American Surety Co.,* (3rd Cir.), 175 Fed. 200, affirmed, 179 Fed. 699; *New Era Homes Corp. v. Forester,* 299 N. Y. 303, 86 N. E. 2d 757, 22 A. L. R. 2d 1338; and see annotation in 22 A. L. R. 2d 1343.

The case of *Alabama v. King & Boozer, supra,* seems to support the legal principle advanced by the appellee here. In that case King and Boozer sold lumber on the order of "cost-plus-a-fixed-fee" contractors to be used by them in building an Army camp for the United

States. The question for decision was whether the Alabama sales tax with which the seller was chargeable, but which he was required to collect from the buyer, infringed any constitutional immunity of the United States from state taxation. The contract provided that the contractors were to furnish labor and materials and to do all things necessary for the completion of the specified work. The Government undertook to pay a fixed fee to the contractors and to reimburse them for specific expenses, including their expenditures for all supplies and materials and state and local taxes which the contractors might be required to pay on account of the contract. The contract also provided that the title to all materials and supplies, for which the contractors were "entitled to be reimbursed", should vest in the Government upon delivery at the site of the work and upon inspection and acceptance by the Contracting Officer. The Government reserved the right to furnish any and all materials necessary for completion of the work and to pay directly to persons concerned all sums due from the contractors for labor, materials, and other charges. The Government in that case contended that for all practical purposes the purchases were in reality made by the United States and were, therefore, entitled to the constitutional immunity. The Supreme Court, in denying this contention, as pointed out by the appellee here, said, among other things:

> "* * * we think all the provisions which we have mentioned, read together, plainly contemplate that the contractors were to purchase in their own names and on their own credit all materials required, unless the Government should elect to furnish them; that the Government was not to be bound by their purchase contracts, but was obligated only to reimburse the contractors when the materials purchased should be delivered, inspected and accepted at the site. * * * The lumber was sold and delivered on the order of the contractors which stipulated that the

Government should not be bound to pay for it. It was in fact paid for by the contractors who were reimbursed by the Government pursuant to their contract with it. The contractors were thus purchasers of the lumber within the meaning of the taxing statute, and as such were subject to the tax. They were not relieved of the liability to pay the tax either because the contractors in a loose and general sense were acting for the Government in purchasing the lumber or, as the Alabama Supreme Court seems to have thought, because the economic burden of the tax imposed upon the purchaser would be shifted to the Government by reason of its contract to reimburse the contractors."

The following was also said in that case, in answer to the argument that the extensive supervision and control maintained by the Government operated to vest title in the Government, which is the same contention made by the appellant here.

"The Government, to support its thesis that it was the purchaser, insists that title to the lumber passed to the Government on shipment by the seller, and *points to the very extensive control by the Government over all purchases made by the contractors.* It emphasizes the fact that the contract reserves to Government officers the decision of whether to buy and what to buy; that purchases of materials of $500 or over could be made by the contractors only when approved in advance by the contracting officer; that the Government reserved the right to approve the price, to furnish the materials itself, if it so elected; and that in the case of the lumber presently involved, the Government inspected and approved the lumber before shipment. From these circumstances it concludes that the Government was the purchaser. The necessary corollary of its position is that the

Government, if a purchaser within the taxing statute, became obligated to pay the purchase price. "But however extensively the Government may have reserved the right to restrict or control the action of the contractors in other respects, neither the reservation nor the exercise of that power gave to the contractors the status of agents of the Government to enter into contracts or to pledge its credit. See *United States v. Algoma Lumber Co.*, 305 U. S. 415, 421, 83 L. Ed. 260, 263, 59 S. Ct. 267; *United States v. Driscoll*, 96 U. S. 421, 24 L. Ed. 847. It can hardly be said that the contractors were not free to obligate themselves for the purchase of material ordered. The contract contemplated that they should do so and that the Government should reimburse them for their expenditures. It is equally plain that they did not assume to bind the Government to pay for the lumber by their order, approved by the Contracting Officer, which stipulated that it did not bind or purport to bind the Government. The circumstance that the title to the lumber passed to the Government on delivery does not obligate it to the contractor's vendor under a cost-plus contract more than under a lump sum contract. Cf. *James v. Dravo Contracting Co.*, 302 U. S. 134, 82 L. Ed. 155, 58 S. Ct. 208, 114 A. L. R. 318, *supra; United States v. Driscoll, supra.*" (Italics supplied).

In the instant case the appellant was obligated to pay the purchase price of the materials. The Government was not so obligated and did not get title until final delivery and acceptance of the goods for which it had contracted. See *Curry v. United States*, 314 U. S. 14, 86 L. Ed. 9. The appellee cites the following quotation from *James v. Dravo Contracting Co., supra,* the opinion being written by Chief Justice Hughes, where, in quoting from *Union P. R. Co. v. Peniston,* 18 Wall. 5, 33, 36,

21 L. Ed. 787, 792, 793, the Supreme Court of the United States said:

> " 'It may, therefore, be considered as settled that no constitutional implications prohibit a State tax upon the property of an agent of the government merely because it is the property of such an agent. A contrary doctrine would greatly embarrass the States in the collection of their necessary revenue without any corresponding advantage to the United States. A very large proportion of the property within the States is employed in execution of the powers of the government. It belongs to govern mental agents, and it is not only used, but it is necessary for their agencies. United States mails, troops, and munitions of war are carried upon almost every railroad. Telegraph lines are employed in the national service. So are steamboats, horses, stagecoaches, foundries, shipyards, and multitudes of manufacturing establishments. They are the property of natural persons, or of corporations, who are instruments or agents of the General government, and they are the hands by which the objects of the government are attained. Were they exempt from liability to contribute to the revenue of the States it is manifest the State governments would be paralyzed. While it is of the utmost importance that all the powers vested by the Constitution of the Untied States in the General government should be preserved in full efficiency, and while recent events have called for the most unembarrassed exercise of many of those powers, it has never been decided that State taxation of such property is impliedly prohibited. * * *' "

Appellant contends that there is no legal difference between the contracts under paragraph 3, *supra*, and those under paragraph 4, *supra*, because under Federal

law, when a progress payment is made, even though the contract is silent as to the creation of a lien, nevertheless such a lien comes into being. It relies on 31 *U. S. C. A.*, Section 529, (first enacted in 1823, 3 Stat. 723); 41 *U. S. C. A.*, Section 154, (enacted February 19, 1948, 62 Stat. 24); and other statutes; *United States v. Butterworth-Judson Corp.*, (1925), 267 U. S. 387, 69 L. Ed. 672. Being of the opinion that the contracts in paragraph 3, *supra,* were not subject to the constitutional immunity from taxation by this State, property subject to contracts in paragraph 4, *supra,* are certainly not so immune and it is not necessary that we pass upon the legal difference. The order will be affirmed.

*Order affirmed, with costs.*